Standard Asbestos Mfg. & Insulating Company v. Commissioner.
Standard Asbestos Mfg. & Insulating Co. v. Commissioner
Docket No. 104268.
United States Tax Court
1942 Tax Ct. Memo LEXIS 58; 1 T.C.M. (CCH) 173; T.C.M. (RIA) 42626; December 4, 1942
*58 Albert F. Hillix, Esq., 1007 Bryant Bldg., Kansas City, Mo., for the petitioner. Angus R. Shannon, Jr., Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, J.: The Commissioner determined deficiencies in income tax and excess profits tax against petitioner for 1937 of $13,655.54 and $4.284, respectively. The only issue presented is whether the petitioner is entitled to a deduction of $49,100 taken as a loss on certain corporate stock. Findings of Fact The petitioner is a Missouri corporation, organized in 1918 and has its principal office in Kansas City, Missouri. It filed its income tax return for 1937, which was prepared from books kept on the accrual basis, with the collector for the sixth district of Missouri. In 1927 the petitioner had a branch office in Tulsa, Oklahoma, which was in charge of W. L. Walker. A man by the name of Reed had been granted a patent for the manufacture of "flexible" forms for use in concrete construction work. The forms were made of wood and metal, the sides being made of wood and the top being of metal supported by wooden slats. In some undisclosed manner Walker acquired an interest in the patent. On July 27, 1927, Walker *59 organized Southwest Flexible Form Company, sometimes hereafter referred to as Southwest, to engage in the erecting and dismantling of forms for use in pouring or running concrete in building operations. Southwest was incorporated under the laws of Oklahoma and its authorized capital stock consisted of $49,000 par value preferred stock and $51,000 par value common stock, both of which had voting rights. The common stock was issued to Walker and Reed as promotion stock. By some arrangement, the details of which are not disclosed by the record, Southwest obtained the right to use the patent. Under this arrangement Southwest was required to pay a royalty of one-fourth of one cent per square foot for the use in its business of the forms which it appears to have made. The forms used by Southwest afforded numerous advantages over the forms commonly used in concrete construction. Southwest could use its forms on an average of 20 times, while the ordinary forms could be used on an average of only 3 times. The Southwest forms provided smoother finish to concrete construction and were of such character that they could be quickly removed and reset for further use. An adequate inventory of such *60 forms represented a considerable investment but the advantages flowing from their use permitted a very profitable operation under favorable building conditions. Walker approached the president of the petitioner for a loan of $1,000 to put into Southwest but after a discussion of the matter it was agreed that the petitioner would pay $49,000 cash for the preferred stock of Southwest and that it would also receive $25,000 par value of the common stock as a bonus which would give petitioner control of Southwest. Beginning about December 1927 and continuing through 1929 the petitioner paid to Southwest $26,162.85 in cash, paid accounts owing by it in the total amount of $737.15, transferred to it merchandise in the amount of $6,652.81, transferred an automobile which the petitioner had purchased for $845.91 and transferred an account receivable in the amount of $14,701.28 owing to petitioner by Standard Asbestos & Cork Company, making a grand total of $49,100 paid for the preferred stock and $25,000 par value of the common stock. With the exception of a payment of $100 in cash which was made in December 1929 all of the foregoing payments and transfers were made by the end of 1928. Walker *61 refused to carry out that part of the agreement which provided for transfer to petitioner of $25,000 par value of Southwest common stock. Suit was brought against him and on May 19, 1929, decree was entered directing transfer of the stock to the petitioner. Except for a few of the shares certificates for the common stock and the preferred stock in Southwest were issued in the name of George M. Ryder, treasurer of the petitioner. George M. Ryder never paid anything personally for the stock and the stock did not belong to him. He held it for petitioner. Walker and his associates continued in charge of Southwest until near the end of 1929. In that year Walker resigned as manager. By the end of 1929 Southwest had sustained a deficit of $40,465.45 representing losses of $8,400.29, $20,330.71 and $11,734.45 susta&ned &n 1927, 1928 and 1929, respectively. After obtaining control of Southwest and following the resignation of Walker, the petitioner placed it under new management. During 1930 and 1931, especially in 1930 when there was a building boom in Oklahoma City, Southwest had about all of the business it could handle. On its income tax return for 1930 it reported a loss of $6,177.85 *62 for the year and on its return for 1931 showed an income of $6,728.90 for that year. A marked decline in building activity developed in 1931 and by 1932 almost no building was going on in the area in which Southwest was operating. After discussion of the situation at an informal meeting of certain of its and petitioner's officers, it was agreed that operations should be suspended to be resumed when building conditions should become more stable. Accordingly, on or about May 1, 1932, operations by Southwest were discontinued and its forms and equipment were stored until business should be resumed. Southwest's business had been operated from leased property in Oklahoma City, on part of which it erected an office and warehouse. When business was suspended the concrete forms were stacked on cross ties on the open part of the lot and in piles about 10 feet high. The piles were arranged in rows about 8 feet apart so as to make the forms readily accessible for future use. They were stacked both for protection against the weather and so as to permit the circulation of air through them, which was essential to their preservation. The forms were in good condition, a substantial portion of them *63 having been used only a few times. The petitioner had been considering the establishing of a branch of its business in Oklahoma City and it was agreed that Southwest would turn over its office and warehouse to petitioner if petitioner would take care of its forms. Petitioner assumed the lease obligation and agreed to help further by giving employment to Southwest's personnel during the period that its activities should be suspended. The petitioner accordingly employed Southwest's entire staff. On its income tax return for 1932, Southwest reported a net loss of $7,805.97. The closing balance sheet attached to the return disclosed assets, liabilities and capital as follows: Assets
Cash
$ 10.55
Accounts Receivable
100.00
Meter Deposits
98.36
Employees Expense Ad-
vance
300.00
Office Library
23.10
Office Furniture & Fix-
tures (Less Reserve for
Depreciation)
561.99
Tools and Equipment
1,639.90
Shop Equipment (Less
Reserve for Deprecia-
tion)
311.17
Warehouse Building &
Yard (Less Reserve for
Depreciation)
1,816.51
Patents
36.90
Contract to Use Patent
Rights
$51,200.00
Less: Reserve for De-
preciation
14,063.33
37,136.67
Concrete Forms (Includ-
ing Column Clamp
Equipment)
$31,231.56
Less: Reserve for De-
preciation
18,869.10
12,362.46
$ 54,397.61
Liabilities and Capital
Liabilities: Accounts Payable
$ 4,455.66
Capital: Preferred Stock
$49,000.00
Common Stock
51,000.00
100,000.00
$104,455.66
*64 At December 31, 1932, Southwest owed petitioner on account of advances $4,419.44. When Southwest discontinued operations earlier in the year, petitioner had taken over certain of its assets including office furniture and fixtures, tools, shop equipment and some supplies. Up to December 31, 1934, petitioner had not credited Southwest with any amount on account of the assets taken over but had given it credit for a cash payment of $300 made in 1933. In December 1934 the warehouse and some of the tools and equipment were destroyed by fire, and on December 31 petitioner by further credits covering office building and improvements, stationery and supplies, merchandise, tools, yard equipment, salvage value of the warehouse and fire insurance proceeds, reduced the indebtedness of Southwest, as per its books, to $1,665.30. Due apparently to a bookkeeping oversight Southwest was never given credit for office furniture and fixtures, which, at December 31, 1932, had a depreciated cost of $561.99. The warehouse was rebuilt by petitioner in 1935 and enlarged about the middle of 1936, at which latter time a garage was built on the side. For use in making the enlargement and addition, petitioner's *65 superintendent of construction was instructed to pick out from the Southwest forms stored on the lot those in the poorest condition and which could not be repaired for future use. As a result, about 125 forms were selected and used. In selecting the forms used the superintendent made sample tests over the lot and found the remaining forms in very good condition. About the middle of 1937 the manager of petitioner's Oklahoma City branch moved some of the forms for the purpose of making a further addition to the warehouse. He discovered that the metal in the forms moved was badly corroded and concluded that it would be impossible to use the forms again. At or shortly thereafter, and under date of July 8, 1937, he wrote to Richard E. Ryder, president of Southwest, who was then employed by the petitioner in Borger, Texas, as follows: I have just finished an inspection of the Flexible Form equipment of the Southwest Flexible Form Company and was surprised to find that it will probably be a complete loss. It would appear that snow and moisture has blown through the piles of forms which has resulted in corrosion to such an extent that it will be impossible to utilize this equipment again *66 for Form Work. Of course there will be considerable salvage in the column clamps. If it is a fact that this equipment is of no value to the form company, I would like to get rid of it as it is taking up a lot of room, but I do not care to take the responsibility [sic] of making a decision in a matter this large so I wish you would make arrangements to stop here (as I understand that you are making a trip to Kansas City) and between us we will decide what is best to do after we together have made a thorough inspection of the equipment. Upon receipt of the letter, Ryder went to Oklahoma City. He was joined there by his brother, George M. Ryder, and they with Hughes, who had written the letter, after a thorough inspection, concluded that the forms were no longer usable. At a special meeting of the board of directors of Southwest held on July 28, 1937, the following action was taken, as shown by the minutes of the meeting: The chairman announced that the meeting had been called to consider the present situation of the company. He advised that upon a thorough investigation it had been found that the entire flexible form equipment, which had been stored at the office address, had disintegrated *67 to such an extent that it was worthless, and could not be used again as concrete forms. Besides the rusted flexible forms, the only assets the company now possesses is their steel column clamps for which he had an offer of FIVE HUNDRED AND FIFTY ($550.00) Dollars, which appears to be a fair price for second hand clamps. The Board was therefore asked to determine what could be done under the circumstances. After full discussion on motion of G. B. Hughes, duly seconded and declared carried, the President was instructed to sell if possible or junk, the flexible form equipment, dispose of the column clamps to the best advantage possible, and to apply any receipts to the settlement of the company indebtedness, and that after this is attended to the Board would consider the affairs of the Southwest Flexible Form Company liquidated and, to all intents and purposes closed. The clamps referred to in the abovequoted resolution were sold for $550. The forms were junked, nothing being received therefor. The $550 was applied on the indebtedness owing to Southwest to the petitioner, leaving the unpaid balance as per its books at $1,115.30, which balance the petitioner charged off under date of *68 December 31, 1937. Upon liquidation of Southwest in 1937 petitioner realized nothing on its stock investment therein. At all times from 1932, when Southwest suspended operations, until liquidation was decided upon in July of 1937, it was the intention of Southwest's officers that it should resume operations when conditions were favorable and such a resumption of business by Southwest was discussed and considered in December of each year at the annual conference of petitioner's officers, some of whom were also officers of Southwest. Regular meetings of the stockholders and directors of Southwest were held in each year. The last of these meetings was held in Oklahoma City on January 4, 1937, at which time officers and directors were elected to serve for the ensuing year. The Southwest stock owned by petitioner became worthless in 1937. Opinion In its income tax return for 1937, petitioner took a deduction of $1,115.30 representing the indebtedness of Southwest charged off in that year. It also took a deduction of $49,100 as a loss sustained in that year in the Southwest stock. The respondent disallowed the latter deduction. According to Southwest's balance sheet of December 31, *69 1932, it had assets of a total value of $54,397.61, consisting of $37,136.37 representing the right to build and use certain patented forms in concrete construction; $12,362.46 representing the undepreciated cost of forms on hand; and $4,989.48 representing the undepreciated cost of miscellaneous assets, including furniture and fixtures, tools and other equipment. The total liabilities, exclusive of capital stock, amounted to only $4,455.66 and of that amount $4,419.44 was owing to petitioner indicating a book value for the stock in the amount of $49,941.95. The patented forms used by Southwest offered substantial advantages in concrete construction, and while an adequate inventory of such forms represented a substantial investment as compared with the ordinary forms, the advantages flowing from their use permitted profitable operation under favorable building conditions. Southwest had suspended operation in 1932 because of depressed conditions in the building trade, but expected to resume its activities as soon as conditions warranted. It had a substantial inventory of forms on hand, all in good condition, some having been used only two or three times, and great care was taken that *70 they be stacked in such manner as to preserve them for future use. They had a depreciated cost of $12,362.46, but were estimated by one or more of Southwest's offices to have had a value of approximately $30,000 at the time operations were suspended in 1932. In July of 1937 it was discovered that the forms were in such state as to be of no further use, and after full consideration and discussion of the situation Southwest's board of directors voted complete liquidation. Liquidation was concluded in 1937 without any recovery by petitioner on its investment in Southwest's stock. It is apparent therefore that any value the Southwest stock may have had, potential or actual, came to an end in that year. It is the contention of the respondent that the Southwest stock was worthless prior to 1937. In support of this contention, it is argued that the corrosion or rusting of the nails and the metal parts of the forms was a gradual, not a sudden, process and must have completed their destruction within two to three years of the date the forms were stacked, or at least a year prior to the beginning of the taxable year. In addition the respondent points out that the loss deduction would have *71 been of little benefit to petitioner in any of the years prior to 1937 and suggests that we should therefore infer that petitioner postponed the taking of the said deduction beyond the year in which the loss actually occurred, and until 1937, when greater deduction benefits could be enjoyed. The petitioner, on the other hand, points to the fact that the forms were very carefully stored to protect them from the elements; that inspections, some more or less casual, were made on numerous occasions during the intervening years and the forms appeared to be in good condition; that in 1936 a careful check of the forms was made for the purpose of removing any bad forms for use in construction of the addition to the warehouse and that the remaining forms were found to be in good condition; that at all times until July 1937 Southwest expected to resume operations and there can be no possible basis in fact for the claim that petitioner had postponed the claim of deduction beyond the year of actual loss in order to obtain a greater tax benefit. All of these facts, it is argued, support and justify the conclusion that the Southwest stock did not become worthless until 1937. Petitioner also relies *72 on testimony to the effect that the forms did not depreciate materially until the breaking down or chipping off of the protective crust or coating of concrete which had gathered around the nails and metal parts during the use of the forms, thereby preventing and postponing the rusting out of the nails and other metals. There can be no doubt from the evidence that the officers of Southwest looked upon its business and property as having substance and value until July 1937, nor that they had every intention of resuming operations as soon as conditions warranted, and we find therefore no merit in the suggestion that the taking of the loss deduction by the petitioner for the year 1937 instead of some prior year was not in good faith. Furthermore, we think the evidence of record and the facts as found therefrom amply support the conclusion that the Southwest stock became worthless in 1937, and we have so found. The petitioner concedes on brief that the amount of the loss deduction should be reduced by credits for Southwest's furniture and fixtures taken over by petitioner without credit to Southwest therefor and for that portion of Southwest's slab forms used in 1936 in constructing *73 the garage and addition to the warehouse. Effect will be given to these concessions in the settlement under Rule 50. Decision will be entered under Rule 50.